# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-11-00118-CR

**Kris Michael Lewis Turnbull, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 65621, THE HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted Kris Michael Lewis Turnbull of capital murder and the trial court automatically sentenced him to life in prison without parole because the State did not seek the death penalty. *See* Tex. Penal Code § 19.03(a)(2). In three points of error on appeal, Turnbull challenges the trial court's admission of a surveillance video recording, denial of a requested jury instruction, and admission of a firearms lab report. We affirm the trial court's judgment of conviction.

### BACKGROUND

Timothy Manning, the senior dispatcher for the Express Cab Company in Nolanville, Texas, was shot and killed on the morning of September 26, 2009. A security surveillance video recording showed that he was alone at the cab company that Saturday morning when, at approximately 8:00 a.m., Turnbull entered the dispatcher's office and began a conversation with him. The record reflects that the two were acquainted due to Turnbull's previous employment at the cab

company the past two summers. During the conversation, Turnbull walked around the office, occasionally looking out the window, as Manning moved about the office working. At one point, Manning sat down at his desk to work. Turnbull walked to look out the window one last time then moved behind Manning with a handgun in his hand. He stopped behind Manning, pointed the gun at the back of his head, took aim for a few seconds, and pulled the trigger. As Manning's body fell to the floor, Turnbull kicked in the door of the cab company owner's office. Once inside the office, he took the drop box that contained the collected cab fares from the night shift and removed a small safe disguised as a book from the bookshelf above the desk.[1] Turnbull then stole the keys to one of the cabs and left.

Cab drivers Mike Ferrell and Alice Lloyd arrived for work around 8:30 a.m. Ferrell discovered Manning lying on the floor of the dispatcher's office in a pool of blood. He attempted to revive him while Lloyd called 911. Nolanville EMT Volunteer Firefighters and deputies from the Bell County Sheriff's Office responded to the scene where they found Manning dead. The deputies learned from the owner of the cab company, Ernest Turner, that the premises was monitored by a digital video surveillance system that permitted live viewing and, in addition, recorded the events captured by four surveillance cameras. Turner disconnected the entire system and gave it to the deputies, who took it to the sheriff's office. At the sheriff's office, both Turner and Ferrell watched, separately, the recording from the morning hours of September 26, 2009, which captured the entire

---

[1] Testimony from the cab company owner, Ernest Turner, indicated that Turnbull was the only employee who knew about the secret safe—a small metal box designed to look like a book—and where it was kept because he had helped Turner count receipts during his previous employment.

2

murder and robbery. Both immediately recognized and identified the person who shot Manning as Turnbull.[2] Ferrell testified that a few weeks before the murder, Turnbull had told him that he needed money and was going to "jack" someone, meaning rob them. He also testified that he recognized the jacket and shoes Turnbull was wearing on the recording.[3]

The missing cab was discovered a short distance from the cab company. A Browning 9 mm handgun, which had been stolen from the father of Turnbull's girlfriend, was recovered from the residence of one of Turnbull's friends whom he had visited on the day of the murder.[4] Subsequent ballistics testing indicated that the gun recovered from that residence was the murder weapon.[5] Turnbull was still wearing the distinctive shoes he had on in the video recording when he was arrested that night, approximately 15 hours after the murder.

The State indicted Turnbull for capital murder, alleging that he murdered Manning during the course of robbing him. The State called 14 witnesses and introduced numerous items of evidence, including the surveillance video recording from the cab company and still photographs

---

[2] Turner testified that Turnbull had worked for him during the previous two summers and he "loved him like a son." Ferrell had known Turnbull since Turnbull was a child, having dated his mother, and had helped Turnbull gain employment at the cab company.

[3] According to the testimony at trial, Turnbull's black jacket had a unique pattern and distinctive label. His brown Fila shoes had velcro straps that Turnbull always wore undone.

[4] Roberta Tamez testified that she saw Turnbull enter her son's room carrying a black jacket across his arm at approximately 9:45 a.m. the morning of September 26, 2009. After about five minutes, he came back out of the room without his jacket. The following day, she found that jacket hanging in her son's closet. In close proximity to the jacket, on the shelf just above, was a handgun that she had never seen before. The gun was not there prior to Turnbull's visit and did not belong to any family members.

[5] Ballistics testing demonstrated that the Browning 9 mm was the firearm that had ejected a shell casing found at the crime scene near Manning's body.

3

from it, the jacket and gun recovered from the Tamez residence, the shell casing recovered from the crime scene near the body, the autopsy report, the firearms report, and numerous photographs of Manning and the crime scene. Turnbull did not testify or call any witnesses. The jury found him guilty of capital murder as charged. As mandated by statute, the trial court imposed a sentence of imprisonment for life without parole. *See* Act of May 20, 2009, 81st Leg., R.S., ch. 765, § 1, 2009 Tex. Gen. Laws 1930 (amended 2013) (current version at Tex. Penal Code § 12.31(a)(2)) (individual adjudged guilty of capital felony in case in which State does not seek death penalty shall be punished by imprisonment for life without parole). Turnbull appeals his conviction.

## DISCUSSION

On appeal, Turnbull complains about the admission of a surveillance video recording depicting the capital murder, the denial of his requested jury charge instruction for the lesser-included offense of murder, and the admission of a firearms lab report concerning the results of ballistics testing conducted on the murder weapon.

### Authentication

In his first point of error, Turnbull argues that the trial judge abused her discretion by admitting the surveillance video recording from the cab company because it was not adequately authenticated under Rule 901 of the Texas Rules of Evidence.

The requirement of authentication or identification is a condition precedent to the admissibility of evidence and is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Tex. R. Evid. 901(a). Rule 901 "does not erect a

4

particularly high hurdle, and that hurdle may be cleared by circumstantial evidence." *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.) (quoting Peter T. Hoffman, *Texas Rules of Evidence Handbook*, Article IX at 948 (8th ed. 2008–09)). The proponent of the evidence does not need "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Id.* The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012); *Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd).

The trial court's role is limited to determining whether the proponent of evidence requiring authentication has presented a prima facie case, i.e., evidence sufficient to support a jury finding that the item in question is what its proponent claims. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007); 1 Steven Goode, et al., *Texas Practice Series: Guide to the Texas Rules of Evidence* § 901.1 (3d ed. 2002); *see* Tex. R. Evid. 104(b). A trial court's decision as to whether evidence is properly authenticated is reviewed under an abuse-of-discretion standard. *Tienda*, 358 S.W.3d at 638; *see Druery*, 225 S.W.3d at 502. A trial court does not abuse its discretion by admitting evidence when it reasonably believes that a reasonable juror could find that the evidence has been authenticated. *Druery*, 225 S.W.3d at 502; *see Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We will not reverse the trial court's decision to admit or exclude evidence unless its ruling lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007); *see Tienda*, 358 S.W.3d at 638.

Authentication can be accomplished in various ways, including by direct testimony from a witness or circumstantial evidence. Rule 901(b) provides a nonexclusive list of methods for authenticating evidence that includes the testimony of a witness with knowledge that a matter is what it is claimed to be. Tex. R. Evid. 901(b)(1). "[A]s with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." *Tienda*, 358 S.W.3d at 639.

In this case, the trial court heard testimony from two witnesses familiar with the video surveillance system regarding the video evidence. Ernest Turner, who bought and installed the surveillance system, testified that the system included four video surveillance cameras that were installed in his office, the dispatcher's office, the driver's lounge, and the garage area. He explained that the cameras fed into a monitor located in his office that allowed for split screen viewing so he could monitor all four locations at the same time. The system also included a digital recorder so that in addition to watching live events, any events captured by the cameras would be recorded. Turner testified that the system and recorder were operating properly on the day of the murder, that the recorder made an accurate recording, and that the recording was a fair and accurate recording of what was recorded that day. While he conceded that he had no personal knowledge of what happened in the cab company that morning, he expressed that he did not see how the system could have recorded anything but what actually happened. Turner disconnected the entire system and gave the digital video recorder and monitor to the sheriff's deputies at the murder scene that morning. He followed them to the sheriff's office to view the recording. He watched the video, except the portion depicting

the actual shooting, and identified Turnbull as the individual on the recording.[6]  In preparation for trial, Turner reviewed the recording, again exclusive of the actual shooting.  He testified that, to his knowledge, the recording had not changed or been tampered with in any way.

In addition, prior to Turner's testimony, Mike Ferrell, the cab driver who discovered Manning, testified about the surveillance video recording.  He was familiar with the security system and testified that the system was capable of recording events that occurred at the cab company, was properly working the day of the murder, and did in fact make an accurate recording on that day.  He was present when the sheriff's deputies removed the whole system to take to the sheriff's office.  At the sheriff's office, he watched the entirety of the recording from that morning, up to the point that showed his arrival and discovery of Manning.  He testified that he reviewed the recording in preparation for trial and that the recording and still photographs taken from the system fairly and accurately represented what he had previously seen when he watched the recording at the sheriff's office on the day of the murder.

We conclude that this evidence was sufficient for the trial court to determine that the testimony concerning the surveillance video recording was sufficient for a reasonable jury to determine that the recording was authentic—that is, that the recording was in fact an accurate video recording of the events that occurred that morning at the cab company.  Thus, we discern no abuse of discretion on the part of the trial court in admitting the surveillance video recording.  Accordingly, we overrule Turnbull's first point of error.

---

[6]  The record reflects that Turner suffered from severe anxiety issues requiring medication. He feared that watching the actual shooting of Manning, whom he was "quite fond of," would cause him to have a stroke.

7

**Lesser-Included-Offense Instruction**

In his second point of error, Turnbull argues that the trial court erred in denying his request for an instruction in the jury charge on the lesser-included offense of murder.

Initially we observe that Turnbull's argument supporting his request for the murder instruction on appeal differs somewhat from his argument at trial. At trial, Turnbull argued there was insufficient evidence of robbery because of a question regarding ownership of the property. He only disputed the evidence of the aggravating element of murder during the course of robbery to the extent that he disputed who the victim of the robbery was. He argued that the evidence at trial demonstrated that the owner of the cab company, Ernest Turner, owned the property stolen, not the deceased victim, Timothy Manning. Thus, he maintained, the evidence established the murder of Manning but the robbery of Turner, rendering the evidence insufficient to prove the capital murder alleged in the indictment and entitling him to the murder instruction. On appeal, however, Turnbull asserts that the evidence at trial demonstrated the possible involvement of another person, Turnbull's friend Cecil Thompson, in the robbery and perhaps the murder. He argues that from the evidence of Thompson's possible participation, a jury could believe that the robbery was "an afterthought of Manning's death" not connected to the murder. Thus, on appeal he argues that the evidence is insufficient to prove the aggravating element at all, and instead demonstrates only a murder separate from a robbery.

Arguably, Turnbull is procedurally barred from asserting that the trial court's ruling should be reversed on this additional legal theory. An appellate court may *affirm* a trial court's decision on a legal theory not presented to the trial court because the ordinary notions of procedural

8

default do not require a prevailing party to list or verbalize in the trial court every possible basis for upholding its decision. *Hailey v. State*, 87 S.W.3d 118, 121–22 (Tex. Crim. App. 2002); *State v. Huddleston*, 164 S.W.3d 711, 716 (Tex. App.—Austin 2005, no pet.). However, an appellate court may not *reverse* a trial court's decision on a legal theory not presented to the trial court by the complaining party because the ordinary notions of procedural default do not permit a trial court's decision to be reversed on a theory the trial court did not have an opportunity to rule on and upon which the non-appealing party did not have an opportunity to develop a complete factual record. *Hailey*, 87 S.W.3d at 122; *Huddleston*, 164 S.W.3d at 716. Here, Turnbull raises this argument—that evidence of Thompson's possible involvement entitled him to the murder instruction—for the first time on appeal. The record does not reflect that it was raised or argued at the conference on the jury charge. Because Turnbull did not raise this contention below, it is arguably waived. *See Miller v. State*, 335 S.W.3d 847, 858 (Tex. App.—Austin 2011, no pet.). Nevertheless, because Turnbull raises the same basic legal issue in both instances—that he was entitled to a jury instruction on the lesser-included offense of murder—we address both arguments.

Determining whether a defendant is entitled to a lesser-included-offense instruction requires a two-part analysis. *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011); *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007). We first consider whether the offense contained in the requested instruction is a lesser-included offense of the charged offense. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011); *Hall*, 225 S.W.3d at 535. If so, we must decide whether the admitted evidence supports the instruction. *Goad*, 354 S.W.3d at 446; *Rice*, 333 S.W.3d at 144.

By definition, murder was a lesser-included offense here because it could be established by proof of the same or less than all the facts required to establish the commission of capital murder. *See* Tex. Code Crim. Proc. art. 37.09(1); *see also Young v. State*, 283 S.W.3d 854, 875–76 (Tex. Crim. App. 2009) (noting Court of Criminal Appeals has long held that murder is lesser-included offense of capital murder). Thus, the first step is satisfied.

The second step of the lesser-included-offense analysis determines if there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Rice*, 333 S.W.3d at 145; *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006). The evidence must establish the lesser-included offense as "a valid, rational alternative to the charged offense." *Rice*, 333 S.W.3d at 145 (quoting *Hall*, 225 S.W.3d at 536); *Segundo v. State*, 270 S.W.3d 79, 91 (Tex. Crim. App. 2008). We consider all of the evidence admitted at trial, not just the evidence presented by the defendant. *Goad*, 354 S.W.3d at 446; *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993). "'Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge.'" *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011) (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). We may not consider "'[t]he credibility of the evidence and whether it conflicts with other evidence or is controverted.'" *Goad*, 354 S.W.3d at 446–47 (quoting *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994)). However, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction

10

on a lesser-included offense is warranted." *Sweed*, 351 S.W.3d at 68 (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)).

For the purposes of robbery, "owner" means a person who has possession of the property or a greater right to possession of the property than the actor. *See* Tex. Penal Code § 1.07(35)(A). Thus, contrary to Turnbull's assertions at trial, Manning was the owner of the appropriated property and the evidence was sufficient to establish that Turnbull committed the murder during the course of robbing Manning. The trial court properly denied the murder instruction based on Turnbull's request at trial.

Further, Turnbull's argument on appeal is based on speculation. Turnbull speculates that from evidence of Thompson's possible involvement, if such evidence existed, the jury could believe that Thompson "bore more responsibility for the decision to kill [Manning]" or that the robbery "was an afterthought of Manning's death." We fail to discern how evidence of Thompson's participation supports either inference or, more importantly, how such inferences entitle him to the murder instruction. First, who "bore more responsibility" for the murder does not negate the fact that the murder Turnbull committed occurred during the course of robbery. Second, Turnbull fails to explain how Thompson's involvement demonstrates that the robbery was "an afterthought" of the murder. The evidence at trial demonstrated that before Manning's body hit the floor, Turnbull was kicking in the office door to steal the money—the collected cab fares from the night as well as the money in the secret book safe. *See Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010) (theft of property from victim's home occurring immediately after victim attacked supported inference that murder occurred during course of robbery).

11

In this case, what elevated the offense from the lesser to the greater was committing the murder during the course of the robbery. Turnbull fails to identify any evidence negating the "during the course of robbery" element alleged. That Thompson may also have been involved does not negate or rebut the evidence of Turnbull shooting and killing Manning during the course of robbing him. Thus, evidence of Thompson's purported involvement does not negate the theory of the greater offense of capital murder—murder committed during the course of robbery—to enable a rational jury to conclude that he was guilty only of the lesser-included offense of murder.

In sum, the record does not contain evidence from which a rational trier of fact could determine that Turnbull was guilty only of murder. Consequently, Turnbull was not entitled to an instruction on that lesser-included offense and the trial judge did not err in refusing the instruction. Point of error two is overruled.

**Admission of Firearms Report**

In his final point of error, Turnbull maintains that the admission of the firearms report concerning the ballistics testing conducted on the murder weapon violated his right of confrontation.

At trial, Calvin Story, a forensic scientist from the Department of Public Safety, testified about ballistics testing conducted on the Browning 9 mm handgun recovered from the closet in the Tamez residence, the shell casing recovered at the murder scene, and the bullet fragments removed from Manning's body. He testified about the lab procedure involving the verification process of ballistics testing. According to his testimony, an examiner test fires the weapon and makes the comparative analysis, then submits the case to a second examiner who re-examines the evidence to verify the results. The lab report concerning the results of the comparison is prepared

12

only after the results of the test-firing analyst are verified by the second examiner. In this case, Story was the verifying analyst. He testified that the lab was unable to determine whether the bullet fragments from Manning's body were from a projectile fired from the Browning 9 mm.[7] In addition, Story testified to his expert opinion that the cartridge (shell casing) case found at the crime scene was fired from the Browning 9 mm. He also indicated that that was the opinion of the other firearms examiner as well. Turnbull did not object to any of this testimony. Story confirmed that "a report [was] made documenting what [he had] just testified to." When the State offered that firearms report, prepared by the test-firing analyst, with attached copies of that analyst's notes reflecting Story's verification of the results, Turnbull objected to the admission of the firearms report "as being hearsay because [the other examiner] is not present to present it." The trial court overruled the objection.

Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Wilson v. State*, 311 S.W.3d 452, 473–74 (Tex. Crim. App. 2010). To preserve a complaint for appellate review, a party must have presented a specific and timely request, motion, or objection to the trial court and, further, must have obtained an adverse ruling. Tex. R. App. P. 33.1(a); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Peavey v. State*, 248 S.W.3d 455, 470 (Tex. App.—Austin 2008, pet. ref'd). Even

---

[7] Story indicated that the family characteristics of the fragments were such that they indicated that they could have been fired from the gun. However, not enough individual characteristics were present, in quantity or quality, on any of the seven fragments to allow the lab to eliminate all other guns, which was necessary to be able to conclude that the fragments were in fact fired from that particular gun.

constitutional rights may be waived if the proper objection is not asserted in the trial court. *Saldano v. State*, 70 S.W.3d 873, 886–87 (Tex. Crim. App. 2002); *see Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). The right of confrontation is subject to procedural default; a defendant waives his constitutional right to confront witnesses if he does not object at trial. *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009); *Bunton v. State*, 136 S.W.3d 355, 368 (Tex. App.—Austin 2004, pet. ref'd); *see Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991). Furthermore, the point of error on appeal must comport with the objection made at trial. *Clark*, 365 S.W.3d at 339.

At trial, Turnbull did not object to the admission of the firearms report on any constitutional grounds. More specifically, he failed to assert that it violated his right to confrontation under the United States Constitution as provided by *Crawford v. Washington*, 541 U.S. 36, 53 (2004), or his right to confrontation under the Texas Constitution. Further, the constitutional complaint Turnbull now raises on appeal—the violation of his confrontation rights—does not comport with his hearsay objection at trial. Thus, Turnbull did not preserve for appellate review his complaint that the admission of the firearms lab report violated his right to confrontation. *See Bunton*, 136 S.W.3d at 368 (hearsay objection did not preserve error on confrontation claim); *see also Routier v. State*, 112 S.W.3d 554, 586 (Tex. Crim. App. 2003) (complaint not preserved for review because trial objection of statutory violation did not comport with constitutional complaint asserted on appeal). We overrule Turnbull's third point of error.

## CONCLUSION

Having overruled all three points of error, we affirm the judgment of conviction.

14

_____

Melissa Goodwin, Justice

Before Justices Puryear, Rose, and Goodwin

Affirmed

Filed:   October 24, 2013

Do Not Publish

15